**In re David Roy HUTCHINSON and Liberty Dawn Hutchinson, Debtors.**

No. 05 43445 13.

United States Bankruptcy Court, D. Kansas.

Oct. 5, 2006.

See also 353 B.R. 287.

Paul Post, Topeka, KS, for Debtors.

**ORDER SUSTAINING TRUSTEE'S OBJECTION TO CONFIRMATION AND TO DEBTORS' EXEMPTION OF PER CAPITA INCOME, DENYING MOTION FOR TURNOVER, WITHOUT PREJUDICE, AND CONTINUING MOTION TO DISMISS AND TO CONVERT**

JANICE MILLER KARLIN,
Bankruptcy Judge.

This matter is before the Court on the Trustee's Motion for Turnover,[1] the Trustee's Objection to Confirmation,[2] the Trustee's Motion to Dismiss,[3] the Trustee's Motion to Convert,[4] and the Trustee's Objection to Debtors' Claims of Exemptions.[5] Central to each of these motions and ob-

1. Doc. 5.

2. Doc. 64.

3. Doc. 65.

4. Doc. 97.

5. Doc. 114. Also pending in this case is the Trustee's Application for Allowance of Administrative Expense Claim (Doc. 43). Since the legal analysis in that matter is unrelated to the issues decided here, that application will be resolved by a separate order.

jections is Debtors' proposed treatment and use of certain per capita distributions that they have received, or are entitled to receive, during the pendency of this Chapter 13 proceeding. The parties have submitted stipulations of facts and briefs, and the Court is now ready to rule. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## I. FINDINGS OF FACT

The Court makes the following findings of fact based upon the stipulations filed by the parties, including the stipulated exhibits.[6] The Prairie Band of Potawatomi Indians of Kansas Tribe (the "Tribe") owns a casino on its reservation located 15 miles north of Topeka, Kansas. A portion of the revenue received from the operation of this casino is divided quarterly among the enrolled members of the Tribe on a per capita basis. Whether to make the distributions, as well as the exact amount of the distributions, is in the discretion of the governing body of the Tribe. Once the Tribe makes a determination that a distribution will be made and decides the amount of the total distribution, however, each enrolled member of the Tribe is entitled to receive an equal distribution, as fixed by tribal ordinance.

Members of the Tribe are not required to provide any services, or to exchange any property of value, to receive their per capita distributions. The distributions are not based upon the need of the individual tribal members, but rather are distributed on a per capita basis regardless of the financial circumstances of individual members. In fact, the Tribe is generally unaware of the individual financial circumstances of its enrolled members. Debtor, David Hutchinson, is an enrolled member of the Tribe

and has received, and is likely to continue to receive, per capita distributions.

This case was originally filed as a Chapter 7 proceeding on October 3, 2005. Debtors listed the per capita distributions on Schedule I, and claimed that Debtor, David Hutchinson, receives on average $233.33 per month from the Tribe, but the actual amount varies, and is not actually received by him on a monthly basis. Instead, for the last two years, the per capita checks have been issued quarterly by the Tribe. Debtors' Statement of Financial Affairs reflects receipt of $2,647.00 in 2003 and $3,216.00 in 2004 from these per capita distributions. Debtors did not claim the per capita distributions as exempt on Schedule C, and they were not in possession of any per capita payments at the time of filing.

On December 1, 2005, the panel Chapter 7 Trustee filed a Motion for Turnover of the per capita distributions, claiming that the distributions, including the right to future distributions, were an asset of the estate and should be turned over to the Trustee for administration. Debtors objected to this motion on the basis that the distributions were not property of the estate and further argued that even if they were, the distributions were exempt under either federal or tribal law.

Debtors subsequently filed a motion to convert their case to one under Chapter 13; that motion was granted May 2, 2006. Debtors also filed their original Chapter 13 plan on May 2, 2006, amending it one week later. On June 2, 2006, the Chapter 13 Trustee filed an objection to confirmation of the amended plan as well as a motion to dismiss. Each pleading claimed that the amended plan did not satisfy the "best interest of the creditors" test, pursuant to

6. Doc. 103.

11 U.S.C. § 1325(a)(4), because "the debtors' per capita rights constitute a non-exempt asset of the bankruptcy estate."[7]

On June 7, 2006, Debtors filed an Amended Schedule C, and for the first time claimed the per capita distributions as exempt, relying on 11 U.S.C. § 522(d)(10)(A) and K.S.A. 60–2312(b). On June 20, 2006, the Chapter 13 Trustee objected to the newly claimed exemptions on the basis that the per capita distributions were not exempt under the statutes relied upon by Debtors. The United States Trustee filed an objection to the Chapter 13 Trustee's Motion to Dismiss on July 13, 2006, claiming that the case should be converted to one under Chapter 7, instead of being dismissed, in the interest of the creditors.

Following this objection, the Chapter 13 Trustee filed a motion to re-convert the case to a Chapter 7 proceeding on the basis that the amended plan did not satisfy the "best interest of the creditors" test, and because Debtors had spent, instead of placing in escrow, the per capita distributions as they were received during the litigation of this contested matter.[8] The Trustee claimed the Debtors had earlier agreed to escrow the funds. Debtors objected to the motion to re-convert on July 19, 2006, claiming that their plan did meet the "best interest of the creditors" test, arguing that discussions regarding escrow of the distributions were never formalized, and contending that as debtors in possession in a Chapter 13 case, they had the authority to use the estate assets as they saw fit.

On August 28, 2006, Debtors filed a second Amended Schedule C, which added 25 U.S.C. § 410 as an additional basis for claiming the per capita distributions as exempt. The Chapter 13 Trustee objected to this claimed exemption by again arguing that the exemption was not supported by the statute relied upon by Debtors. Additional facts will be discussed below, when necessary.

## II. CONCLUSIONS OF LAW

This Court is simultaneously issuing a decision in *In re McDonald*, Case No. 02–42850–7, which is a Chapter 7 case also dealing with per capita distributions from the Prairie Band Potowatomi Tribe. The Court incorporates by reference the general discussion contained in that opinion concerning the background of per capita distributions that are being derived from gaming revenues arising out of the operation of a casino on Potowatomie tribal land, and other tribal lands, located within Kansas.

The Court must here decide four issues: (1) whether the per capita distributions are property of the estate, (2) if the distributions are property of the estate, whether they are exempt under 11 U.S.C. § 522(d)(10)(A) or 25 U.S.C. § 410, (3) if they are a non-exempt asset of the estate, whether Debtors' plan meets the "best interest of the creditors" test, and (4) whether the motion for turnover should be granted while this case proceeds in Chapter 13.

### A. The per capita distributions are property of the estate.

The first issue the Court must determine is whether the per capita distributions, including the right to receive them in the future, constitute property of the

7. Docs. 64 and 65.

8. Debtor David Hutchinson received $825 on December 15, 2005, $788 on March 15, 2006, and $865 on June 16, 2006. The Court sus-

pects, but does not know, that he likely also received a distribution on or about September 15, 2006.

estate. Debtors do not appear to contest this issue, instead focusing on the exemption issues and their right to use the property during the pendency of the Chapter 13. Nonetheless, the Court finds it useful to state, for the record, that it finds that the per capita distributions do constitute property of the estate, as the Court has more fully explained in the opinion issued today in *In re McDonald*. This issue was thoroughly addressed in *In re Kedrowski*,[9] albeit concerning distributions from a different tribe, and the Court adopts the holding and reasoning of the *Kedrowski* opinion as it relates to the issue of whether per capita distributions constitute property of the estate.

### B. The per capita distributions are not exempt under 11 U.S.C. § 522(d)(10)(A) or 25 U.S.C. § 410.

■ Debtors' second Amended Schedule C claims that the per capita distributions are exempt pursuant to 11 U.S.C. § 522(d)(10)(A) and 25 U.S.C. § 410. Section 522(b) of the Bankruptcy Code [10] specifies that a debtor can take the exemptions enumerated in § 522(d) unless applicable state law specifically provides otherwise, in which case debtors are restricted to the exemptions found in state and local law, as well as exemptions found in federal law other than the Bankruptcy Code. Kansas has opted out of the federal exemptions, and has enacted its own set of exemptions.[11]

■ Federal Rule of Bankruptcy Procedure 4003 governs exemptions, and sub-section (c) of that Rule provides: "In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed." This means that the claimed exemption is presumed to be valid, and the Trustee has the burden of producing evidence to rebut the presumption. If he does so, the burden then shifts back to Debtors to come forward with evidence to demonstrate that their claimed exemption is proper.[12]

#### 1. 25 U.S.C. § 410 is inapplicable in this case.

■ Although the parties do not address this issue in their briefs, Debtors' second Amended Schedule C claims that the per capita distributions are exempt under 25 U.S.C. § 410. That section states that "[n]o money accruing from any lease or sale of lands held in trust by the United States for any Indian shall become liable for the payment of any debt of, or claim against, such Indian contracted or arising during such trust period, or, in the case of a minor, during his minority, except with the approval and consent of the Secretary of the Interior."

A review of the record in this case, including the stipulations and briefs filed by the parties, reveals no factual basis to support this claimed exemption. It is clear that the per capita distributions are the product of a portion of the net gaming revenues generated by the tribal casino, rather than "from any sale or lease of lands held in trust by the United States

---

**9.** 284 B.R. 439 (Bankr.W.D.Wis.2002).

**10.** This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 become effective. All statutory references to the Bankruptcy Code are thus to 11 U.S.C.A. §§ 101—1330 (2004), unless otherwise specified. All references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr.P. (2004), unless otherwise specified.

**11.** *See In re Lampe*, 331 F.3d 750, 754 (10th Cir.2003) (citing K.S.A. 60–2312).

**12.** *In re Robinson*, 295 B.R. 147, 152 (10th Cir. BAP 2003).

for any Indian" as required by 25 U.S.C. § 410.

### 2. The per capita distributions are not exempt under § 522(d)(10)(A).

■ Although the exemptions found in § 522(d) are generally inapplicable to Kansas debtors pursuant to K.S.A. 60–2312(a), Kansas law contains a specific exception that allows debtors to claim those exemptions found in § 522(d)(10). Subsection 522(d)(10)(A), upon which Debtors rely, provides an exemption for a debtor's right to receive "a social security benefit, unemployment compensation, or a local public assistance benefit." Debtors argue that the per capita distributions are exempt pursuant to § 522(d)(10)(A) because they constitute "a local public assistance benefit."

The issue of whether governmental payments constitute a local public assistance benefit has not been frequently addressed in reported federal court decisions. In *In re Longstreet*,[13] the United States Bankruptcy Court for the Southern District of Iowa addressed the issue of whether federal earned income credits on federal taxes constituted a public assistance benefit.[14] The *Longstreet* court noted that

"Public assistance benefit" is not a technical phrase, and it has not acquired a peculiar and appropriate meaning in law. Neither the Iowa exemption statute nor the case law interpreting it define the

term in a unique fashion. Black's Law Dictionary (7th ed.1999) does not define "public assistance" or "public assistance benefit." A plain reading of [the Iowa statute] suggests the phrase should be construed according to the context of the statute and its common meaning. Merriam Webster's Collegiate Dictionary (10th ed.1994) defines "public assistance" as "government aid to the needy, blind, aged, or disabled persons and to dependent children."[15]

In *In re Wilson*,[16] the district court in Iowa addressed the issue of whether payments made to farmers under the Farm Security and Rural Investment Act qualified as public assistance benefits. The *Wilson* court adopted the plain meaning definition provided by the court in *Longstreet* that the phrase "public assistance benefits" means "government aid to needy, blind, aged, or disabled persons and to dependent children."[17]

A similar definition is provided under Kentucky law, as discussed in the context of the federal child tax credit in *In re Beltz*,[18] which defines public assistance as "'... money grants, assistance in kind or services to or for the benefit of needy aged, needy blind, needy permanent and totally disabled persons, needy children or persons with whom a needy child lives or a family containing a combination of these categories ....'"[19] Other courts that have addressed the issue of what constitutes a public assistance benefit have similarly found that need is a critical requirement.[20]

---

**13.** 246 B.R. 611 (Bankr.S.D.Iowa 2000).

**14.** Unlike this case, the exemption at issue in *Longstreet* was actually created by Iowa statute rather than the federal exemptions in § 522(d)(10), although the language mirrored that of the federal exemption, and thus is at least instructive of how other courts have addressed this exemption.

**15.** *In re Longstreet*, 246 B.R. at 614–15.

**16.** 305 B.R. 4 (N.D.Iowa 2004).

**17.** *Id.* at 15.

**18.** 263 B.R. 525 (Bankr.W.D.Ky.2001).

**19.** *Id.* at 530 (quoting K.R.S. 205.010(3)).

**20.** *See, e.g. In re Crampton,* 249 B.R. 215 (Bankr.D.Idaho 2000) (applying Idaho law in holding that the federal Hope tax credit,

A general query of Kansas statutes for a definition of the term "public assistance" did not reveal a precise definition, but the context of each statute where that term appears centers around people in need.[21] For example, K.S.A. 59–2801, entitled "Representative for purpose of receiving and managing certain public assistance payments," provides that a personal representative can be appointed "if any otherwise qualified applicant for, or recipient of old age assistance, aid to the blind, aid to the permanently and totally disabled, or general assistance or payee in the case of aid to dependent children, is or shall become unable to manage the assistance payments, or otherwise fails so to manage, to the extent that deprivation or hazard to himself or herself or others results..."

■ Based upon the existing case law, and the general sense of the concept of "public assistance" as that term is used throughout Kansas statutes, the Court adopts the definition of "public assistance benefit" set forth in *Longstreet* as "government aid to needy, blind, aged, or disabled persons and to dependent children." Having determined the appropriate definition to use when construing § 522(d)(10)(A), the Court must now turn to the purpose behind the tribal per capita distributions to determine whether they meet this definition.

■ Debtors contend that the legislative history behind the creation of the per capita distributions demonstrates that they are intended to be public assistance benefits. Debtors argue that the Indian Gaming Regulatory Act (IGRA),[22] which governs the Tribe's ability to operate a casino on its reservation, requires that net revenues received from the casino be used only for the following purposes: (1) to fund tribal government operations or programs, (2) to provide for the general welfare of the Indian tribe and its members, (3) to promote tribal economic development, (4) to donate to charitable organizations, or (5) to help fund operations of local government agencies.[23] It is the second provision, "to provide for the general welfare of the Indian tribe and its members," that Debtors claim brings the per capita distributions within the definition of a public assistance benefit. The Court disagrees.

Pursuant to the stipulations between the parties, the per capita distributions "are not based upon the need of individual tribal members but, rather, are distributed on a per capita basis, regardless of the financial circumstances of individual recipients." Although these distributions may be made with the goal of providing for the general welfare of the tribe and its members, as required by the IGRA, there is no indication that these distributions are specifically aimed at assisting "needy, blind, aged, or disabled persons and to dependent chil-

which provides an incentive to obtain higher education, was not a public assistance benefit, at least in part, because it was not focused on helping the poor, as compared to the federal earned income tax credit) and *In re Brockhouse,* 220 B.R. 623 (Bankr.C.D.Ill.1998) (applying Illinois law and holding that federal earned income tax credits are exempt as public assistance payments because the purpose of the earned income tax credit is to provide a payment to low income families to help them meet the basic costs of living).

21. *See, e.g., State ex rel. Secretary of SRS v. Jackson,* 15 Kan.App.2d 126, 130, 803 P.2d 1045 (1991) (holding, based on K.S.A. 39–709(a), that assistance may be granted to needy persons under certain criteria, and that funds from trust were not available resource to Jackson for purpose of determining her eligibility for public assistance benefits), *aff'd in part and rev'd on other grounds in part,* 249 Kan. 635, 822 P.2d 1033 (1991).

22. 25 U.S.C. § 2701 *et seq.*

23. 25 U.S.C. § 2710(b)(2)(B) and (d)(1)(A)(ii).

dren." The phrases "provide for the general welfare" and "aid to needy, blind, aged, or disabled persons and to dependent children" are not synonymous. In fact, the distributions are made in equal amounts to all enrolled tribal members regardless of need. Despite being for the "general welfare" of the tribal members, the Court finds that the per capita distributions are not public assistance benefits, and are thus not exempt under § 522(d)(10)(A).

### C. Debtors' amended Chapter 13 plan does not meet the "best interest of the creditors" test.

The Trustee filed an objection to confirmation of the amended plan, as well as motions to dismiss and convert this case, alleging that Debtors have not met the "best interest of the creditors" test. That test, articulated under § 1325(a)(4), requires that the Chapter 13 plan provide distributions to each allowed unsecured creditor that are not less than what the unsecured creditor would have received if the debtor's estate were liquidated under a Chapter 7 proceeding. This provision essentially allows Chapter 13 debtors to "buy-out" non-exempt, prepetition assets by paying their value to unsecured creditors with increased payments (or payments over a longer term) to the Trustee over the life of the plan. Debtors bear the burden of proving that they have met all of the requirements of § 1325, including the "best interest of the creditors" test under § 1325(a)(4).[24] The Court finds that Debtors have failed to meet this burden.

As noted above, in order to comply with this test, Debtors' plan must propose to pay their unsecured creditors an amount at least equal to what those creditors would have received had the bankruptcy estate been liquidated under a Chapter 7 proceeding. According to the parties' stipulations, the amended plan "does not propose to pay any money to unsecured creditors." Therefore, the plan can only be confirmed if Debtors can show that a liquidation of the estate would have resulted in no payments to unsecured creditors.

If the bankruptcy estate were liquidated, the trustee would collect and sell all non-exempt, unencumbered property of the estate of consequential value and divide the proceeds from the sale among the unsecured creditors. Debtors contend that the per capita distributions cannot be valued because of the uncertain nature of the per capita distributions, including whether the distributions will continue, or if they continue, for how long and in what amount. Debtors claim that "[t]he quandary as to valuation of the per capita payments is solved by the fact that the debtors' plan proposes to devote all of the projected disposable income to plan payments during the life of the plan."

The Court disagrees with Debtors' position. First, Debtors' commitment to pay all of their disposable income to the plan payments during the life of the plan satisfies the requirements of § 1325(b)(1)(B), otherwise known as the best effort requirement, but it has no bearing on the "best interest of the creditors" test. The requirements of § 1325(b)(1) and § 1325(a)(4) must both be met to secure confirmation of a plan, and the fulfillment of one has no bearing on the other.[25]

---

24. *See In re Barnes,* 32 F.3d 405 (9th Cir. 1994) (holding that the debtor has the burden of proving that each element of § 1325 is met).

25. *See In re Miller,* 247 B.R. 795, 798 (Bankr. W.D.Mo.2000) (holding best effort requirement "was intended to be in addition to, and not an alternative for, the best interests of creditors requirement of § 1325(a)(4)") (cit-

Second, simply because the present value of the per capita distributions might be difficult to ascertain does not mean that those distributions have no value. Many property interests held by debtors are difficult to value, such as life estates or interests in partnerships or corporations, or the value of mineral interests, due to the many variables that surround such interests. The fact that a property interest may be difficult to value does not mean the property has no value.[26] Debtors, who bear the burden of proof on this issue, have presented no evidence to support their claim that the property has no value. The fact that distributions have been regularly made by the Tribe in recent history is, alone, evidence of some value.[27]

Whatever value can be assigned, by an actuary or other professional, to the per capita distributions must be provided for in Debtors' Chapter 13 plan in the form of payments to the unsecured creditors to satisfy the "best interest of the creditors" test. Debtors' plan proposes to pay nothing to unsecured creditors, and as such likely fails to satisfy the requirements of § 1325(a)(4), unless the Trustee and creditors, after this opinion is issued, decline to object to confirmation of another plan that similarly provides for no distribution.

### D. This Trustee is not entitled to turnover of the per capita distributions pursuant to § 1303.

The final issue before the Court is the Trustee's motion for turnover of these funds. As discussed earlier, this case was originally filed as a Chapter 7 proceeding, and the motion for turnover was actually filed by the Chapter 7 Trustee. The Motion is now being prosecuted by the Chap-

---

ing *In re Willingham*, 83 B.R. 552 (Bankr. S.D.Ill.1988)); *In re Fries*, 68 B.R. 676 (Bankr.E.D.Pa.1986); and *In re Rogers*, 65 B.R. 1018 (Bankr.E.D.Mich.1986). *See also* 5 Norton Bankruptcy Law and Practice 2d § 122:3 (2006) (noting that the debtor must satisfy all conditions of § 1325(a) for confirmation).

**26.** *See, e.g., In re Baum*, 22 F.3d 1014, 1017 (10th Cir.1994) (holding that the value of debtor's life estate can be reached for the benefit of his creditors unless it was found exempt). *See also In re Kedrowski*, 284 B.R. at 447 (noting that "[i]t is true that the casino business is a 'risky enterprise.' ... However, it is a *business*—in fact, ... tribal gaming operations are '[l]ike other entertainment industries.' ... As such, tribal per capita distributions are far more conceptually akin to an interest in a business enterprise than they are a gift, a license, or some form of public assistance. Someone who owns stock in a company, or holds a limited partnership interest in a business, may never receive a distribution on that interest. The business may encounter a poor economic climate, may find expenses outpacing revenues, and may even fail. But should the company ever issue a dividend, all stockholders receive an appropriate amount in relation to their interest. Clearly, those

who hold a 'right' to receive payment from the operation of a business hold some sort of intangible property right under Wisconsin law.) (citations omitted). It should also be remembered that in determining what 'would be paid' in a Chapter 7 case is admittedly an 'artificial concept created by statu[t]e, and practical considerations, such as the length of time required for a Chapter 7 case to run its course, are to be given no weight.'" 5 Norton Bankruptcy Law and Practice 2d § 122:7 (2006).

**27.** Whether a plan meets the "best interest of creditors" test is determined as of the effective date of the plan. In most Chapter 13 cases, the date the order of confirmation is entered is the effective date. We know here that since the date of filing of this case, Debtors have received approximately $1600, and likely $2400, since a distribution was expected mid-September 2006. Since the Court holds that these distributions are property of the estate, and not exempt, debtors would be required to turn over this property in a Chapter 7. That fact, alone, seemingly demonstrates this property has some value for the "best interest of creditors" test.

ter 13 Trustee. Debtors contend that the Chapter 13 Trustee cannot compel the turnover of estate property. The Court agrees in this context.

Pursuant to § 1303, a debtor in a Chapter 13 proceeding "shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b) . . . ." Section 363(b) authorizes the trustee to use, sell, or lease property of the estate. Therefore, § 1303 vests the exclusive right to use and control estate property in the Chapter 13 debtors. Had this case remained a Chapter 7 proceeding, the Chapter 7 Trustee would have retained the right to use or sell the property, and the motion for turnover would have been appropriate, given the Court's holdings that the per capita distributions are non-exempt property of the estate. However, conversion of this case to the pending Chapter 13 proceeding requires that the motion for turnover of the payments be denied. The Court will, however, require that Debtors turn over to the Trustee a copy of each payment advice received regarding the per capita distributions, since conversion, so that the Trustee can monitor the amount of payments received by Debtors.

The Court stresses, however, that the denial of the motion for turnover, and Debtors' rights to use the property of the estate as they see fit pursuant to § 1303, does not relieve Debtors of their obligation to satisfy all the requirements of § 1325. For example, if a debtor owned a boat that he used while operating as a part-time fishing guide outside of his regular job to earn extra money, and he proposed to use the revenue that boat helped create to fund his Chapter 13 plan, then the debtor would likely be allowed to retain the boat rather than liquidate it for the benefit of his unsecured creditors. However, in order to satisfy the requirements of § 1325(a)(4), that debtor would be re-

quired to provide payments to the unsecured creditors, through the Chapter 13 plan, sufficient to pay them what they would have received had the boat been liquidated. Similarly, if Debtors propose to retain their right to spend the per capita distributions to pay their ongoing living expenses and to help fund their Chapter 13 plan, they have the right to do so. However, they too have to provide payments to the unsecured creditors in an amount equal to what those creditors would have received if the right to receive those payments were liquidated.

### III. CONCLUSION

Based upon the foregoing discussion, the Court sustains the Trustee's objection to Debtors' attempt to exempt the per capita distributions, and finds they are not exempt under § 522(d)(10)(A) or 25 U.S.C. § 410. The Court also finds that Debtors' current Chapter 13 plan fails to satisfy the "best interest of the creditors" test required by § 1325(a)(4), because the per capita distributions to which David Hutchinson became entitled upon the date of filing, and to which the parties stipulate he will become entitled in the future, do not appear to be properly valued. Therefore, the Court sustains the Trustee's objection to confirmation of the amended plan. The Court will reserve ruling on the Trustee's motion for conversion and motion to dismiss in order to provide Debtors with an opportunity to revise their Chapter 13 plan to comply with the requirements of § 1325(a)(4).

The Court is aware of the parties' stipulations that Debtors cannot afford to pay more than the $455 proposed plan payment, and that they "have no real way to repay the money other than by using the distributions in the future or they would 'find a way' or perhaps extending their plan." It may thus prove futile to allow

Debtors an opportunity to amend their plan, consistent with this decision. Nevertheless, the Court will give Debtors that opportunity to propose a plan that meets the provisions of § 1325, now that they have the benefit of the Court's views on these issues.

It may be that the Trustee, the creditors, if interested, and Debtors, may come to an agreement that Debtor may not receive many more distributions, or that distributions in the future will be less, for any variety of reasons, such as that the casino is making less net profit because of additional competition or less efficient operation, or the Tribe is likely to use the net profits in other ways, or that a valid spendthrift clause might be added, or that more enrolled members will become eligible for distributions, thus reducing each per capita share, or that Debtor's life expectancy doesn't warrant an expectation of long-term benefits, or because the casino business is a "risky enterprise," [28] or for a variety of other reasons. The Debtors will be given an opportunity to meet the "best interests of the creditors" test in the subsequent plan.

The Court also denies at this time the Trustee's motion for turnover, which was originally filed by the Chapter 7 Trustee assigned to this case, with the exception of requiring turnover of the payment advices relating to the per capita distributions. Debtors will be given an opportunity to value their right to potentially receive per capita distributions, and to pay that amount to the unsecured creditors by way of an amended plan. If they cannot obtain confirmation of a plan, the case could theoretically be re-converted to a Chapter 7, at which time a motion for turnover might again be ripe.

IT IS, THEREFORE, BY THE COURT ORDERED that the Trustee's Objection to Confirmation of Plan (Doc. 64) and Objection to Debtors' Claim of Exemptions (Doc. 114) are both sustained. The Trustee's Motion for Turnover (Doc. 5) is denied without prejudice as to the turnover of the per capita payments, subject to refiling in the event this case is reconverted to a Chapter 7 proceeding, and sustained as to the turnover of all payment advices relating to the per capita payments. The Debtors are to turnover all payment advices, currently in their possession or received in the future, from 2002 forward, including all payment advices for post-petition distributions and future distributions, until the case is dismissed or until further order of the Court. The Court will reserve ruling on the Trustee's Motion to Dismiss (Doc. 65) and the Trustee's Motion to Convert (Doc. 86) to provide Debtors the opportunity to file an amended Chapter 13 plan that satisfies the requirements of § 1325.

IT IS FURTHER ORDERED that Debtors file, and provide notice to creditors of, an amended Chapter 13 plan that complies with this opinion on or before **October 20, 2006**. The Court will continue the Trustee's Motion to Dismiss (Doc. 65) and the Trustee's Motion to Convert (Doc. 86) to **October 25, 2006 at 1:30 p.m.**

---

28. *See In re Kedrowski,* 284 B.R. at 447.